**In re CHILDREN RESIDING AT ST. ALOYSIUS HOME.**

No. 87–166–M.P.

Supreme Court of Rhode Island.

March 28, 1989.

John H. Hines, Smithfield School Committee, David G. Lussier, West Warwick School Committee, for plaintiff.

Steven Placella, Child Advocate, Laureen Quaranto D'Ambra, Dept. of Children and their Families, Francis C. Brown, Court–Appointed Sp. Advocate, for defendant.

## OPINION

KELLEHER, Justice.

This controversy comes to us by way of a discretionary writ of certiorari that was issued pursuant to the provisions of G.L. 1956 (1988 Reenactment) § 42–35–16. The petitioner is the Smithfield School Committee, which claims that the Superior Court justice erred in vacating a decision of the State Commissioner of Education (commissioner). The real parties in interest are the Department of Children and Their Families (DCF) and the Smithfield School Committee.

The facts are not in dispute. St. Aloysius Home for Boys (the Home), which is located in the town of Smithfield, is a private, nonprofit residential facility for dependent and neglected children. St. Aloysius School, which is located in a separate structure on the same real estate parcel, is a private, nonprofit school licensed by the Rhode Island Department of Education (Department of Education) as an elementary school and a special education school for learning disabled and behaviorally disordered students. DCF, acting pursuant to G.L.1956 (1988 Reenactment) § 42–72–5(b)(2), places children at the Home for social rather than educational purposes and contracts with the Home for child-care and residential treatment services.

Pursuant to the DCF–St. Aloysius contracts, the Home agrees to provide the children residing there with supervised room and board on a twenty-four-hour basis, social services, and an on-grounds educational program. The on-grounds educational program is conducted through St. Aloysius School. Although the contracts specifically require the Home to provide tutorial and remedial help where appropriate, no provision is made for the rendering of speech-therapy services.

DCF does not contend that the contracts require the Home to provide these services. However, DCF and the Home both assert that the children have a right to participate in the speech-therapy services conducted through the Smithfield public school system. They cite G.L.1956 (1988 Reenactment) § 16–24–1 in support of their claims. Section 16–24–1 provides that each local school committee has an affirmative obligation to provide all handicapped children residing in its city or town with the type of special education services that will best satisfy their needs. *Smith v. Cumberland School Committee*, 415 A.2d 168, 171 (R.I.1980). The Smithfield School Committee had initially agreed to allow the children to participate in its speech-therapy services but after one academic year denied it owed any obligation to the children and refused to provide any children from the Home with speech-therapy services. The school committee recognizes its general obligation under § 16–24–1 but claims that § 16–24–13 relieves it of all its obligations to the children. Section 16–24–13 essentially provides that classes for retarded and handicapped children are to be provided in all the "state institutions or state schools for the mentally retarded, and also in state operated and state supported facilities where retarded or handicapped children reside."[1] Under this statute, the school committee claims it is DCF, not the school committee, that has the obligation of providing the children with the needed speech-therapy services. This disagreement prompted the director of the Home to request a hearing by the commissioner to settle the dispute.

Pursuant to G.L.1956 (1981 Reenactment) § 16–64–6, as amended by P.L. 1982, ch. 367, § 1, the commissioner entered an interim order on January 8, 1985, ruling that the children were entitled to

---

1. General Laws 1956 (1988 Reenactment) § 16–24–13 reads:

 "Classes for retarded and handicapped children in state residential facilities and institutions.—Classes for retarded children and children with other handicaps as described in the regulations of the state board of regents for elementary and secondary education shall be provided for those children in all the state institutions or state schools for the mentally retarded, and also in state operated and state supported facilities where retarded or handicapped children reside subject to all regulations of the state board of regents for elementary and secondary education."

receive speech-therapy services through the Smithfield public school system on an interim basis until a decision on the merits could be rendered. After a lengthy hearing the commissioner ruled that although § 16–24–1 generally requires local school committees to provide resident handicapped children with special education services, § 16–24–13 carves out a narrow exception to that general mandate and relieves the local school committees of their obligations where applicable. The commissioner, in essence, ruled that § 16–24–13 applies whenever children are *"confined"* to a state-supported or state-operated "closed" facility. The commissioner was of the belief that the Home was a "closed facility * * * in the sense that some children are not allowed to enroll as *full-time students* in the public school system" and ruled, therefore, that § 16–24–13 was applicable. He ruled that, pursuant to § 16–24–13, DCF has the responsibility to contract and pay for the children's speech-therapy services and that Smithfield is not required to afford the children speech-therapy services on a part-time basis. According to the commissioner's decision, every facility where handicapped children reside is to be considered "closed" and within § 16–24–13 unless all the children residing there are allowed to enroll in the public school system on a "full-time" basis.

On appeal a Superior Court justice agreed that § 16–24–13 applies only to state-supported, state-operated, "closed facilities," but in accordance with § 42–35–15(g), the Superior Court justice reviewed the commissioner's decision and ruled that he had erroneously determined that the Home was a "closed" facility within the intended scope of § 16–24–13. The Superior Court justice ruled that the fact that some children were not allowed to enroll in public school on a full-time basis was insufficient to support the conclusion that the entire Home was a "closed facility" under § 16–24–13. According to the Superior Court justice, a closed facility was one akin to a "correctional or psychiatric facility supported by the state." The trial justice then ruled that St. Aloysius was not such a facility and that § 16–24–13 was not

applicable. Instead she ruled that § 16–24–1 controlled, and that the children are entitled access to the speech-therapy services provided by the Smithfield School Committee. She pointed out, however, that the financial burden would not fall solely on Smithfield because the town could seek reimbursement from other cities and towns, as set forth in G.L.1956 (1988 Reenactment) § 16–7–20.

The sole issue we must decide is whether the Superior Court justice correctly ruled that the Home was not a "closed facility" within the meaning of § 16–24–13. This issue necessarily presents a question of statutory construction, and this court is the final arbiter on all questions of Rhode Island statutory construction. *Brennan v. Kirby*, 529 A.2d 633, 637 (R.I.1987). In order to resolve the present controversy, it will be our responsibility to determine and effectuate the policy and intent behind § 16–24–13. 529 A.2d at 637.

■ Because this is the first opportunity we have had to interpret this particular statute, we shall look to rules of statutory construction when they can be of assistance in resolving the task at hand. *The Rake v. Gorodetsky*, 452 A.2d 1144, 1147 (R.I.1982). Rules of construction direct this court to consider all legislation relating to the subject matter covered under a statute in order to determine and effectuate the actual policy and intent behind that statute and to harmonize the overall objective and scope of the legislation. *Rhode Island Higher Education Assistance Authority v. Rhode Island Conflict of Interest Commission*, 505 A.2d 427, 428 (R.I. 1986). When we examine the Rhode Island legislation relating to the care and education of our children, it is obvious that it is the local municipal school committees that act as agents for the state, discharging the legislative responsibility for the entire care, control, and management of all public "educational needs" of children residing in our state. General Laws 1956 (1988 Reenactment) § 16–2–9(a); *see also Cummings v. Godin*, 119 R.I. 325, 330, 377 A.2d 1071, 1073 (1977). This legislation has also made it crystal clear that DCF is the state agen-

cy that is responsible for promoting, safeguarding, and protecting the "social well-being and development" of all the children of this state. Section 42–72–2(5). DCF was established in order to "mobilize" the human, physical, and financial resources available to plan, develop, and evaluate a comprehensive and integrated statewide program of services to ensure the opportunity for all children to reach their full potential. Section 42–72–5(a). Rather than duplicate available community resources such as public education, the Legislature directs DCF to "recruit" and "coordinate" available community resources and activities of the state and its political subdivisions in order to effect the full and fair utilization of those community resources. Section 42–72–5(b)(9), (18).

 Here the community resource that DCF seeks to utilize is the speech-therapy program conducted through the Smithfield public school system. We believe that the Legislature never intended, with its enactment of § 16–24–13, to make such a community resource off limits to DCF. Instead we believe that § 16–24–13 was enacted only to ensure that those children who are unable, because of their care and treatment requirements, to participate in the public school programs are provided special educational services within the facility wherein they reside. Only when the children are unable to leave a facility to attend the public school system, even on a part-time basis, will a facility be "closed" within the intended scope of § 16–24–13. Any other reading of § 16–24–13 would deny DCF an available community resource, to wit, the Smithfield public special education program, and would require DCF to duplicate that available resource, even if only a single child residing in a state-supported facility required speech therapy. Such an approach does violence to the intent of the

existing legislation and would cause an unwarranted expenditure of public funds.

 We agree with the Superior Court justice's conclusion that the Home is not a closed facility within the meaning of § 16–24–13. There is absolutely no evidence indicating that the children are unable to leave the facility, and in fact, DCF and the Home have enrolled some of the children outside the facility in the Smithfield public school system, albeit on a part-time basis. Rather than being "confined" to the facility, the record indicates that the children are encouraged to participate in activities outside the facility. Although DCF does choose to service most of the children's care and educational needs within the Home and St. Aloysius School, the DCF–St. Aloysius contracts also encourage the children's participation in community activities and their utilization of community resources outside the St. Aloysius campus.[2]

 The Superior Court justice correctly ruled that the fact that children at the Home are not allowed to enroll in the public school system on a full-time basis does not, by itself, make the entire facility closed within the meaning of § 16–24–13. This ruling finds substantial support in the Rhode Island Special Education Regulations, which were promulgated by the Rhode Island Board of Regents in order to carry out the policy and intent behind chapter 24 of title 16, pursuant to § 16–24–2. Those regulations have been construed in administrative practice to require local school districts to afford resident handicapped children enrolled in nonpublic schools with a "genuine opportunity" to participate in the public special education programs on a part-time basis. *In re Matter of: Children Residing at St. Aloysius Home,* Decision of the Commissioner of

---

2. The contracts require that the Home agree to provide each boy with the following services, among others:

"c. Recreational activities, both in the home *and the community.* This includes provision by the Provider of space and equipment for indoor and outdoor recreation and the *utilization of school resources, recognized youth groups and/or other group facilities;*

\* \* \* \* \* \*

"h. *Transportation,* as necessary, to medical facilities, *recreation, and other activities;*

\* \* \* \* \* \*

"j. Brokerage and advocacy with and for the child his/her relationships with any element of the social system, *such as schools,* courts, employers, other social agencies, and the like." (Emphasis added.)

Education, 16 (April 8, 1986). Those regulations provide that when a handicapped child is enrolled in a private school like St. Aloysius School and receives special education or related services from a public school, the public school has the primary responsibility to develop special education programs for the children but must ensure that representatives of the private school are able to participate. *See Regulations of the Board of Regents for Elementary and Secondary Education Governing the Special Education of Handicapped Children,* SECTION ONE, V, 4.4 (June 1984).

This controversy, as the trial justice correctly ruled, is controlled by §§ 16–64–1, 16–24–1, and 16–7–20. Section 16–64–1 determines residency for school purposes and provides in relevant part:

"Children placed in group homes, in foster care, in child caring facilities, or by a Rhode Island state agency or a Rhode Island licensed child-placing agency shall be deemed to be residents of the town where the group home, child caring facility, or foster home is located, and this town shall be reimbursed or the child's education be paid for in accordance with § 16–7–20."

The children have been placed in a childcaring facility and are, pursuant to § 16–64–1, residents of the town of Smithfield for school purposes. Consequently the Smithfield School Committee has, because of § 16–24–1, the affirmative obligation to provide the children of St. Aloysius with a genuine opportunity to participate in the municipality's special education programs, even on a part-time basis. Smithfield may then seek financial assistance from other cities and towns pursuant to § 16–7–20. Again we would emphasize that only in situations in which a child, because of his or her care and treatment requirements, cannot leave a facility to attend the public school special education program on even a part-time basis will the provisions of § 16–24–13 become applicable and relieve the school committee from the mandate of § 16–24–1.

The petition for certiorari is denied and dismissed. The writ previously issued is quashed, and the record in this dispute is remanded to the Superior Court with our decision endorsed thereon.